IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

SAMUEL LEWIS THOMAS                                                PLAINTIFF

            v.                        Civil No.  13-5246

DEPUTY WILKINS; DEPUTY RILEY;
DEPUTY BOWMAN; DEPUTY
KILPATRICK; DEPUTY LONG;
and SERGEANT LARA                                                 DEFENDANTS

## REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

This is a civil rights case filed by the Plaintiff pursuant to 42 U.S.C. § 1983.  Plaintiff

proceeds *pro se* and *in forma pauperis.*

Plaintiff is currently incarcerated in the Ouachita River Unit of the Arkansas Department

of Correction (ADC).  The events that are the subject of this case occurred while the Plaintiff

was incarcerated in the Benton County Detention Center (BCDC).  As narrowed by his

deposition testimony, Plaintiff contends his constitutional rights were violated in the following

ways: (1) he was illegally held at the BCDC; (2) excessive force was used against him on several

occasions; (3) he was wrongfully placed in segregation for fighting and remained there for longer

than a White inmate involved in the same incident; and, (4) he was harassed, verbally abused,

and discriminated against by the Defendants.

Defendants have now filed a Motion for Summary Judgment (Doc. 81).  Plaintiff has

filed a number of responses (Docs. 88, 90, 94, 98, & 112).  The Motion is now ready for

decision.

-1-

AO72A
(Rev. 8/82)

## I. Background

On August 14, 2013, at 11:56 p.m., Plaintiff was arrested on public intoxication and criminal mischief charges by officers of the Bethel Heights Police Department.  Defendants' Exhibit (hereinafter Defts' Ex.) 1 (Doc. 83-1) at pgs. 3 & 5; Defts' Ex. 4 (Doc. 83-4) at pg. 8.[1] According to Plaintiff, he had a "spat" with his girlfriend and that was the reason he was arrested.  Defts' Ex. 4 (Doc. 83-4) at pg. 22.

At the time, Plaintiff was on bond on a number of felony criminal charges pending in the Benton County Circuit Court.  Defts' Ex. 1 (Doc. 83-1) at pg. 7; Defts' Ex. 4 (Doc. 83-4) at pgs. 9-10.  A release status hearing had been set by Benton County Circuit Court Judge Brad Karren for August 15, 2014, at 9 a.m.  Defts' Ex. 4 (Doc. 83-4) at pgs. 9, 11 & 16.

Because of the public intoxication charge, Plaintiff was transported to the BCDC. Plaintiff was booked into the jail at 12:51 a.m. on August 15, 2013.  Defts' Ex. 1 (Doc. 83-1) at pg. 3.  It was noted Plaintiff was being held on an "8 Hour Detox."  Id.; see also Defts' Ex. 4 (Doc. 83-4) at pg. 8.  Internal BCDC policy allows for the release of public intoxication arrestees after a minimum of eight hours and a maximum of forty-eight hours of incarceration.  Defts' Ex. 3 (Doc. 83-3) at ¶ 5.

Sergeant Tiffany Bowman, worked in booking at that time, and believed the court appearance was scheduled for 8:00 a.m.  Defts' Ex. 3 (Doc. 83-3) at ¶¶ 4-5.  She indicates that the BCDC's court transport would have left at 7:30 a.m.  Id.  According to Bowman, the earliest Plaintiff could have been released was at 7:56--only four minutes prior to his scheduled court

---

[1] This exhibit is the Plaintiff's deposition.  For this reason, the page references are to the deposition page rather than the CM/ECF document page number.  In all other exhibits, citations are to the CM/ECF document page.

appearance. Id.  Bowman made the decision to transport Plaintiff to Court instead of releasing him on citation. Id.  Bowman was aware of Plaintiff's prior failure to appear (FTP) charges. Id.  According to Bowman, because of the prior FTP charges and the fact that no one was at the jail to pick Plaintiff up for the hearing, she made the decision to transport him. Id.

Plaintiff maintains Bowman violated his constitutional rights by requiring him to remain in custody for more than eight hours for detoxification purposes.  Defts' Ex. 1 (Doc. 83-1) at pgs. 22-30. According to Plaintiff, he had about an hour or an hour and a half after his eight hour detoxification period ended to get to court.  Defts' Ex. 4 (Doc. 83-4) at pgs. 12 & 16.  Plaintiff states that at approximately, 7:00 a.m., he was given back his street clothes and changed into them. Id. at pgs. 15-16.

While he was waiting to get his personal property, Plaintiff was told to change back into his jail uniform and they would transport him to court. Id. at pgs. 17 & 20.  Once he was released, Plaintiff testified that his Father was going to pick him up and take him to Court. Id. at pg. 21.  Plaintiff believed his Father knew he was in jail and would come when called . Id. at pg. 22.

When they arrived at the courtroom, Plaintiff was in a jail uniform (stripes) and shackles. Defts' Ex. 4 (Doc. 83-4) at pg. 22.  Plaintiff explained what had happened to his public defender who he believed would offer an explanation to the judge for the Plaintiff's appearance. Id. at pg. 23.  When it was their turn, Plaintiff states his public defender offered no explanation. Id. Plaintiff believes that because he appeared in Court in a jail uniform and in handcuffs the Judge increased his bond. Defts' Ex. 1 (Doc. 83-1) at pg. 22-30; Defts' Ex. 4 (Doc. 83-4) at pgs. 27-28.

His bond was raised from $36,500 to $73,500.[2]  Defts' Ex. 4 (Doc. 83-4) at pgs. 23 & 28. Plaintiff could not pay the additional bond money and remained incarcerated at the BCDC.  Id. at pg. 24.

On September 5, 2013, Deputy Lara noticed Plaintiff waiting at the pod door.  Defts' Ex. 1 (Doc. 83-1) at pg. 9.  Lara allowed the Plaintiff to step out into the pod control area.  Id.; see also Defts' Ex. 4 at (Doc. 83-4) pg. 32.  Plaintiff began complaining about the kiosk system not working for him.[3]  Id.  The kiosk system was used to make commissary purchases, submit grievances, and to submit requests.  Defts' Ex. 4 (Doc. 83-4) at pg. 34.  Plaintiff asserted that the problem was discriminatory in nature.  Defts' Ex. 1 (Doc. 83-1) at pg. 9; Defts' Ex. 4 (Doc. 83-4) at pgs. 33-34.  Plaintiff indicated that White inmates had access to the system.  Id.  Lara states he advised the Plaintiff to calm down but he did not and was calling Lara a liar and a racist.  Id.

From that point, Lara gives the following account of what occurred.  Lara stepped out of pod control and at the same time Deputy Wilkins heard the commotion and came into the pod control area.  Defts' Ex. 1 (Doc. 83-1) at pgs. 8-9.  Lara instructed Plaintiff to face the wall and go to his knees.  Id.  According to Lara, Plaintiff did not comply.  Id.

The deputies employed pain compliance wrist locks and assisted Plaintiff to his knees. Defts' Ex. 1 (Doc. 83-1) at pgs. 8-9.  The deputies began to help Plaintiff up but he turned towards Lara in what Lara described as an aggressive manner.  Id. at pg. 9.  Plaintiff's hands were placed behind his back and he was escorted to the pod door.  Id. at pgs. 8-9.

---

[2] In some places, Plaintiff indicates his bond was increased to $100,000; while in others, he indicates it was only raised to $73,000 rather than $73,500.  Doc. 88 at pgs. 7 & 15.

[3] Plaintiff testified in his deposition that he was not making a claim about the kiosk system or his inability to access it.  Defts' Ex. 4 (Doc. 83-4) at pg. 38.

Plaintiff's version of these events differs.  He says he was initially instructed just to put his hands on the wall and he complied.  Defts' Ex. 4 (Doc. 83-4) at pg. 35.  When Plaintiff was told he had to go to his knees, Plaintiff indicates he asked "what for."  Id. at pg. 36.  Plaintiff states Lara then started kicking or kneeing his right leg.  Id.  At this point, Plaintiff indicates he told Lara he was going to his knees.  Id.  Plaintiff testified that Lara "mashed" his face against the wall and Plaintiff could smell the spit of other inmates who had been put in the same position.  Id.

Plaintiff testified he must have said something that upset Lara because his arms were wrenched behind his back and Lara and Wilkins "jacked him up" off his knees and "slammed" him into a door.  Defts' Ex. 4 (Doc. 83-4) at pgs. 35-37.  Lara had Plaintiff's left arm and Wilkins his right.  Id. at pg. 41.

Plaintiff indicates his arms were pulled so far up they were almost over his head.  Defts' Ex. 4 (Doc. 83-4) at pg. 36.  The pain in his right arm started getting intense and when Wilkins wrenched it a little more Plaintiff testified he started "hollering."  Id. at pgs. 36-37.  Plaintiff describes the pressure on his arms as enough to pull him "about off [his] feet."  Id. at pg. 40.

After Plaintiff was back in the pod, he noticed that he could barely move his right arm and it felt like it was swelling up inside.  Defts' Ex. 4 (Doc. 83-4) at pg. 37.  A few minutes later, Plaintiff complained of pain and Lara and Wilkins escorted him to the nurse's station.  Defts' Ex. 1 (Doc. 83-1) at pgs. 8-9; see also Doc. 88 at pg. 22.  Plaintiff had also submitted a handwritten medical request complaining about his arm being out of whack.  Defts' Ex. 1 (Doc. 83-1) at pg. 19.[4]  He said the guard bent and pushed his arm up way too high and yanked it.  Id.

---

[4]This form is partially illegible.  The copy submitted by the Plaintiff, Doc. 88 at pg. 26, is slightly more legible.

-5-

Plaintiff was seen at the nurses station complaining of his right elbow and left shoulder hurting.  Defts' Ex. 1 (Doc. 83-1) at pgs. 15 & 19.  Plaintiff also complained of an irritation on his abdomen and left shoulder.  Id. at pg. 15.

The nurse noted no edema or bruising and that Plaintiff had a good range of motion in his left shoulder.  Defts' Ex. 1 (Doc. 83-1) at pg. 19.  Plaintiff was given Tylenol for seven days, 500 mg. three times a day, and hydrocortisone cream twice a day for seven days.  Id.

On September 7, 2013, Plaintiff was seen by the nurse and complained that his right elbow was still sore.  Defts' Ex. 1 (Doc. 83-1) at pg. 15.  However, he indicated it was getting better.  Id.  On September 10, 2013, Dr. Scott Lafferty, the jail physician, ordered an x-ray for his elbow.  The x-ray was taken the following day and showed no significant soft tissue swelling, no abnormal elevation of the anterior or posterior fat pad of the elbow, and no discernable fracture or destructive bone process.  Defts' Ex. 1 (Doc. 83-1) at pg. 10.  Plaintiff testified that after a week or week and a half he regained the full use of his arm.  Defts' Ex. 4 (Doc. 83-4) at pg. 43.  Plaintiff maintains the amount of force used by Lara and Wilkins was excessive.

On September 12, 2013, Plaintiff fought with a fellow inmate, Randy Wishon.  A few minutes later Plaintiff pushed the emergency button and Deputy Riley opened the door and asked what the emergency was.  Defts' Ex. 1 (Doc. 83-1) at pg. 13.  Plaintiff reported having fought with a "White dude" and stated that his arm and face were hit during the fight.  Id.  Plaintiff admitting to hitting back but states he was only protecting himself and the video would clearly show it.  Defts' Ex. 4 (Doc. 83-4) at pg. 47.

-6-

Fighting is included in the BCDC list of infractions that may result in disciplinary action that will result in loss of privileges for up to thirty days and disciplinary segregation for up to thirty days. <u>Defts' Ex.</u> 1 (Doc. 83-1)<u>.</u> at pgs. 31-33.  When inmates fight, Riley states it:

> "is my responsibility to complete an inmate disciplinary form for every inmate involved in a fight and place that inmate on administrative segregation to separate him from the other inmate.  This was not a discretionary decision at my level. Merely receiving a disciplinary action form, however, does not mean that the inmate would be placed in disciplinary segregation.  Instead, inmates were placed on disciplinary segregation only after the disciplinary sergeant made the decision, after a hearing process, to place the inmate on disciplinary segregation.  The inmate could then appeal to the Lieutenant, as Mr. Thomas did in September, 2013, who made the final decision." <u>Defts' Ex.</u> 2 (Doc. 83-2) at pg. 1 ¶ 4.

With respect to Long, Riley states he only performed the "physical function of separating inmates Thomas and Wishon by placing them in separate pods/cells." <u>Defts' Ex.</u> 2 (Doc. 83-2) at pg. 2 ¶ 5.  In addition to completing a jail disciplinary action form, Riley completed a jail incident report.  <u>Id.</u> at pg. 3.[5]

Plaintiff was taken to see Nurse Sara who applied triple antibiotic cream and a band-aid to a scrape on the Plaintiff's right forearm and provided a cold pack for Plaintiff to use on the right side of his temple where he said he had been hit.  <u>Defts' Ex.</u> 1 (Doc. 83-1) at pg. 15.

Riley escorted Plaintiff back to the pod and went to speak with Wishon about what happened.  <u>Defts' Ex.</u> 1 (Doc. 83-1) at pg. 13.  Wishon told Riley that Plaintiff had gone into the public restroom[6] and urinated on the walls, toilets, and all over the floor.  <u>Id.</u>  Wishon stated he cleaned it up and told Plaintiff not to do it again.  <u>Id.</u>

---

[5] The same incident report is in <u>Defts' Ex.</u> 1 (Doc. 83-1) at pg. 13.

[6] The "public restroom" is located in the one or two cells that are left unlocked when inmates are in the day room area.  All other cells are locked and inmates must use the facilities in the open cells.  <u>Defts' Ex.</u> 4 (Doc. 83-4) at pg. 44.

Wishon reported that Plaintiff later called him a b----. Defts' Ex. 1 (Doc. 83-1) at pg. 13. Wishon threw the first punch and they fought for less than a minute. Id.

Plaintiff denies that he urinated on the floor or walls and denies calling Wishon "anything." Defts' Ex. 4 (Doc. 83-4) at pgs. 45-46. However, he testified he knew Wishon was wanting to fight so he tried to be the bigger man and offered to clean it up. Id.

Riley then told both Plaintiff and Wishon that they were on administrative segregation pending a disciplinary hearing for fighting. Defts' Ex. 1 (Doc. 83-1) at pg. 13. Neither Riley or Long made the decision to place Plaintiff on disciplinary segregation. Defts' Ex. 4 (Doc. 83-4) at pg. 48. The decision was made by their sergeant after a hearing and affirmed on appeal by their lieutenant. Id.

Plaintiff did not feel it was right that he was locked down and charged since he acted in self-defense, i.e., he did not throw the first punch. Defts' Ex. 1 (Doc. 83-1) at pg. 20; Defts' Ex. 4 (Doc. 83-4) at pg. 48. Further, Plaintiff believes Riley and Long discriminated against him when he was placed on disciplinary segregation for twenty days following a fight with a White inmate when the White inmate, who had been given the same twenty day punishment, was released after only fifteen days. Id. at pgs. 48-50.

On September 28, 2013, Plaintiff maintains Lara used excessive force against him. Specifically, Plaintiff asserts that Lara and a few other jailers, including Deputy Dewey, sent him back to his cell for "talking back and having an attitude." Defts' Ex. 4 (Doc. 83-4) at pg. 52. Plaintiff testified they followed him back up the stairs yelling and cursing and that Lara pushed him up against the wall, kicked him in his troubled knee, and slammed his head against the wall. Id. at pgs. 51-52. Plaintiff indicated he may have questioned Lara's order to return to his cell

because he was on twenty-three hour lock down and only had that one hour outside of his cell. Id. at pg. 52.

On another occasion, Plaintiff was going to the booking area to be transported to a psychiatric evaluation. Defts' Ex. 4 (Doc. 83-4) at pg. 59. Deputy Kilpatrick stated that Plaintiff did not have his hands behind his back in accordance with a jail rule requiring all inmates walking around the jail to have his hands behind his back. Id. at 59-60. Plaintiff testified that he eventually put his hands behind his back until he was about to take a seat. Id. at pg. 60. At that time, Kilpatrick instructed Plaintiff to go into a holding cell. Id. Plaintiff remained in the holding cell approximately fifteen to twenty minutes. Id. at pgs. 60-61.

Plaintiff believes Kilpatrick was "profiling" him because of his demeanor, character, or because of a potential for violence and using that to harass him. Defts' Ex. 4 (Doc. 83-4) at pgs. 61-62. Other than feeling harassed, Plaintiff suffered no injury. Id. at pg. 62. He felt that he should not have been put in a holding cell and should have been allowed to take a seat. Id. Plaintiff maintains Kilpatrick used excessive force when "he kind of pushed me in the cell." Id. at pg. 73. Specifically, Plaintiff states he was pushed in the back. Id.

Plaintiff testified he was again singled out by Kilpatrick on February 20, 2014, when he was in the booking area for transport to Bethel Heights for a hearing. Defts' Ex. 4 (Doc. 83-4) at pg. 63. Plaintiff was chatting with another inmate and used profanity. Id. Kilpatrick advised Plaintiff not to use profanity and said it offended him. Id. Kilpatrick then put the Plaintiff in a segregation cell for using profanity when talking to another inmate. Id. at pg. 64. Plaintiff believes he should not have been put in the segregation cell. Id. at pg. 75.

-9-

When he returned to the BCDC, Plaintiff maintains he was again singled out by Kilpatrick.  Defts' Ex. 4 (Doc. 83-4) at pgs. 64-65.   Plaintiff was directed to go into a small holding cell.  Id.  When Plaintiff asked why, Kilpatrick replied: "If I tell you to step inside the cell, step inside the cell.  I don't need no . . . lip, talking back."  Id.  at pg. 65.  Plaintiff maintains he was the only inmate put inside a cell.  Id. at pg. 66.  According to Plaintiff, the other two inmates were merely frisked.  Id. at pgs. 66 & 72.  Plaintiff states he was left there quite awhile and finally began kicking the door to get Kilpatrick's attention.  Id.

Plaintiff was told to go to the back of the cell and get on his knees and he complied. Defts' Ex. 4 (Doc. 83-4) at pg. 67.  However, he was irate and was cussing Kilpatrick out.  Id. Plaintiff states his arms were grabbed and wrenched behind his back and up over his head while his head was pushed all the way to the floor.  Id. at pgs. 67-68.  Plaintiff believes he was in this position for six or seven minutes.  Id.  He indicates he was then put in cuffs and the cuffs broke his skin.  Id. at pg. 69.  In fact, Plaintiff testified he still had marks on his wrist.  Id.

Plaintiff testified that Kilpatrick then "proceeded to slam my head against the wall and then drag and yank me down the hall and all the way to my cell."  Defts' Ex. 4 at pg. 69.  Once at his cell, Plaintiff states Kilpatrick and Dewey[7] kept him down on his knees for an uncomfortable amount of time causing him to feel "violated" and causing his knee further damage and pain.  Id. at pgs. 68-69.  Plaintiff admits he was still "mouthing" but states he was not resisting.  Id. at pg. 70.

---

[7]Plaintiff does not contend Dewey used excessive force.  Defts' Ex. 4 (Doc. 83-4) at pg. 76.

-10-

Plaintiff also alleges in his amended complaint that Long used excessive force against him on February, 2014.  Defts' Ex. 4 (Doc. 83-4) at pgs. 77-82.  At the time, Plaintiff states he was merely attempting to obtain his "as needed" medication.  Id.

## II.  Applicable Standard

The Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "[A] genuine issue of material fact exists if: (1) there is a dispute of fact; (2) the disputed fact is material to the outcome of the case; and, (3) the dispute is genuine, that is, a reasonable jury could return a verdict for either party."  *RSBI Aerospace, Inc. v. Affiliated FM Ins. Co.,* 49 F.3d 399, 401 (8th Cir. 1995).  The moving party has the burden of showing the absence of a genuine issue of material fact and that they are entitled to judgment as a matter of law, but the nonmoving party may not rest upon mere denials or allegations in the pleadings and must set forth specific facts to raise a genuine issue for trial.  *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986). The Court must view all evidence and inferences in a light most favorable to the nonmoving party.  *See McCleary v. ReliaStar Life Ins. Co.,* 682 F.3d 1116, 1119 (8th Cir. 2012). However, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  *Scott v. Harris*, 550 U.S. 372, 380 (2007).

-11-

## III.  Discussion

Defendants have moved for summary judgment on the following grounds. First, there is no basis for an official capacity claim against the County. Second, Plaintiff can offer no proof to establish individual liability claims against the Defendants and certainly cannot do so under clearly established law. Third, Plaintiff failed to exhaust his administrative remedies with respect to the following incidents: Lara's alleged use of excessive force against him on September 28, 2013; Kilpatrick's alleged use of excessive force and/or discrimination on three separate occasions; and, Long's alleged use of excessive force against the Plaintiff on February 23, 2014, when Plaintiff complained about not receiving his "as needed" medication.  We will address each argument although not necessarily in the order raised.

### A.  Exhaustion

The Prison Litigation Reform Act (PLRA), 42 U.S.C. § 1997e(a), mandates exhaustion of available administrative remedies before an inmate files suit.  Section 1997e(a) provides: "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."

Exhaustion is mandatory.  *Porter v. Nussle*, 534 U.S. 516, 524-25 (2002).  In *Jones v. Bock,* 549 U.S. 199 (2007), the Supreme Court concluded that "to properly exhaust administrative remedies prisoners must complete the administrative review process in accordance with the applicable procedural rules."  *Id.* at 218 (internal quotation marks and citation omitted).  The Court stated that the "level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to clam, but it is the

-12-

prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." *Id.* "[F]ailure to exhaust available administrative remedies is an affirmative defense, not a matter of subject matter jurisdiction." *Lenz v. Wade*, 490 F.3d 991, 993 n. 2 (8th Cir. 2007).

The Supreme Court in *Booth v. Churner*, 532 U.S. 731, 738-39 (2001) held that "exhaustion is required where administrative remedies are available even if the available administrative remedies do not provide the precise, or full, relief sought." *Walker v. Maschner*, 270 F.3d 573, 577 (8th Cir. 2001). The exhaustion requirement applies to "all inmate suits about prison life." *Porter*, 534 U.S. at 532. This is true whether the claims "involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong. *Id.*

In *Williams v. Norris*, 176 F.3d 1089, 1090 (8th Cir. 1999), the Court held that a claim could proceed because it was exhausted at the time the Court ruled. In *Johnson v. Jones*, 340 F.3d 624 (8th Cir. 2003), the Court was faced with this issue and concluded that in light of the Supreme Court holdings in *Booth* and *Porter,* the holding in *Williams* was "no longer tenable." *Johnson*, 340 F.3d at 627. It stated that:

> "[u]nder the plain language of section 1997e(a), an inmate must exhaust administrative remedies *before* filing suit in federal court. Thus, in considering motions to dismiss for failure to exhaust under section 1997e(a), the district court must look to the time of filing, not the time the district court is rendering its decision, to determine if exhaustion has occurred. If exhaustion was not completed at the time of filing, dismissal is mandatory." *Id.*

With respect to the transmittal of grievances, the BCDC policy on grievances, Policy C-14, provides as follows:

> "A grievance shall be submitted in the form of a written statement by the inmate promptly following the incident on a form specified. Such statements shall be

-13-

transmitted without interference within eight (8) hours to the shift supervisor by the jail deputy or staff member to whom the grievance was given.

The deputy whom the form is given to shall indicate the deputies name, date and time the form was received in the proper spaces on the form." <u>Defts' Ex.</u> 1 (Doc. 83-1) at pg. 38.[8]

With respect to the contents of the grievances, the Policy provides:

"The grievances shall state fully the time, date, names of the jail deputy and/or staff member involved, and pertinent details of the incident, including the names of any witnesses." *Id*.

Defendants first maintain that no grievance was submitted regarding Lara's alleged use of excessive force on September 28, 2013.  While Plaintiff submitted a grievance on September 29, 2013, it did not deal with an alleged use of excessive force.  <u>Doc. 88</u> at pg. 9.

With respect to Kilpatrick, Defendants maintain that Plaintiff submitted no grievances about the three incidents he was involved in.   These incidents are: (1) an unspecified date when Plaintiff was being transported for a psychological evaluation; (2) on February 20, 2014, when Plaintiff was being transported to Bethel Heights for court; and, (3) on February 20, 2014, when Plaintiff was being transported back to the BCDC.

In response, Plaintiff has handwritten onto a grievance dated September 10, 2013, submitted via the kiosk Kilpatrick's name.  <u>Doc. 88</u> at pg. 29.  The grievance itself refers only "one of the bald head younger" deputies. <u>Id.</u>  It also deals with a different incident than the three at issue in this case.

On February 20, 2014, and March 1, 2014, Plaintiff did file grievances about the incidents occurring on his Bethel Heights court date and mentions Kilpatrick by name.  <u>Doc. 88</u>

---

[8] Clearly, the grievance policy has not been updated since the jail began using the electronic touch pad kiosk for the submission of grievances and requests.

at pg. 51 & 53.  However, the incidents occurred, and the grievances were filed, well after this case was instituted.  Similarly, Plaintiff has submitted a number of documents dealing with incidents occurring after the filing of this lawsuit.  See e.g., Doc. 88 at pgs. 30, 34, 36, 42.

Plaintiff indicates he does not know if § 1997e(a) applies to him but asks for the mercy of the Court.  Doc. 94 at pg. 5.  This Court has no discretion in this matter.  Exhaustion is mandated.  Plaintiff cannot pursue in this case claims that he did not submit **grievances** on prior to October 24, 2013, the date the case was filed.  Additionally, because of the exhaustion requirement, he cannot pursue in this case **claims** that arose after October 24, 2013.

In summary, this means that Plaintiff cannot, in this case, pursue the following claims: (1) the claim against Lara arising out of an alleged use of excessive force on September 28, 2013; (2) any of his claims against Kilpatrick; (3) his claim against Long arising out of an incident occurring on February 25, 2014; and, (4) any other claims mentioned in his amended complaint, his deposition, or in his summary judgment responses that arose after October 24, 2013.

## B.  Official Capacity Claims

With respect to the official capacity claims, they are "functionally equivalent to a suit against the employing governmental entity."  *Veatch v. Bartels Lutheran Home*, 627 F.3d 1254, 1257 (8th Cir. 2010).  In other words, the official capacity claims are treated as claims against Benton County.  *See Murray v. Lene*, 595 F.3d 868, 873 (8th Cir. 2010).

To establish Benton County's liability under § 1983, "plaintiff must show that a constitutional violation was committed pursuant to an official custom, policy, or practice of the governmental entity."  *Moyle v. Anderson*, 571 F.3d 814, 817 (8th Cir. 2009)(citation omitted). The applicable law has been summarized as follows:

-15-

"There are two basic circumstances under which municipal liability will attach: (1) where a particular municipal policy or custom itself violates federal law, or directs an employee to do so; and, (2) where a facially lawful municipal policy or custom  was adopted with 'deliberate indifference' to its known or obvious consequences. *Seymour v. City of Des Moines*, 519 F.3d 790, 800 (8th Cir. 2008). There need not be a finding that a municipal employee is liable in his or her individual capacity before municipal liability can attach. *Speer v. City of Wynne*, 276 F.3d 980 (8th Cir. 2002); *Parrish v. Luckie*, 963 F.2d 201, 207 (8th Cir.1992) ('A public entity or supervisory official may be held liable under § 1983 even though no government individuals were personally liable.'). Where an official policy is itself unconstitutional or directs employees to take unconstitutional action, no evidence beyond a statement of the policy and its exercise is necessary to establish § 1983 liability. *Szabla v. City of Brooklyn Park*, 486 F.3d 385, 389-90 (8th Cir. 2007)." *Id*. at 817-18.

To establish the existence of an unconstitutional policy, the Plaintiff must point to "a deliberate choice of a guiding principle or procedure made by the municipal official who has final authority regarding such matters." *Mettler v. Whiteledge*, 165 F.3d 1197, 1204 (8th Cir. 1999).

In *Johnson v. Douglas County Medical Dept*., 725 F.3d 825 (8th Cir. 2013), the Court outlined the necessary elements for establishing the existence of an unconstitutional custom.  It stated:

"To establish a claim for 'custom' liability, [Plaintiff] must demonstrate:

1)  The existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees;

2) Deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and,

3) That Plaintiff was injured by acts pursuant to the governmental entity's custom, i.e., that the custom was the moving force behind the constitutional violation." *Id*., 725 F.3d at 828 (citations omitted).

-16-

With the exception of the alleged informal policy of holding those charged with public intoxication for a period of between eight and forty-eight hours, which will be addressed below, I believe Plaintiff has failed to show the existence of a genuine issue of material fact as to Benton County's liability.

### C.  Excessive Force Claims

Plaintiff has one excessive force claims that he has exhausted his administrative remedies on prior to filing suit.  This incident occurred on September 5, 2013, and involved Lara and Wilkins in the pod control area.

"Because [Plaintiff] was a pretrial detainee at the time of the alleged violation of [his] constitutional rights, we analyze [his] claim against [Defendants] under the Fourteenth Amendment, rather than the Eighth Amendment." *Morris v. Zefferi*, 601 F.3d 805, 809 (8th Cir. 2010)(citations omitted).

"The Due Process Clause of the Fourteenth Amendment protects pretrial detainees from the use of excessive force that amounts to punishment. Because the Due Process Clause prohibits *any* punishment of a pretrial detainee, be that punishment cruel-and-unusual or not, we ask whether the defendant's purpose in using force was to injure, punish or discipline the detainee." *Jackson v. Buckman*, 756 F.3d 1060, 1067 (8th Cir. 2014)(internal quotation marks and citations omitted).

"An official's use of force does not amount to punishment in the constitutional sense if it is but an incident of some other legitimate governmental purpose. . . .  The objective indicia relevant to the excessive-force analysis under the Fourth Amendment guide this due-process inquiry." *Jackson*, 756 F.3d at1067 (internal quotation marks and citations omitted).  These indicia are: "the need for the application of the force, the relationship between the need and the amount of force that was used, the extent of the injury inflicted, and whether [the force] was used

-17-

for punishment or instead to achieve a legitimate purpose." *Andrews v. Neer*, 253 F.3d 1052, 1060-61 & 1061 n.7 (8th Cir. 2001). The relevant inquiry being whether the officials behaved in a reasonable way in light of the facts and circumstances confronting them. *Id.* "But a *de minimus* amount of force is not actionable under the Due Process Clause." *Jackson*, 756 F.3d at 1067.

With respect to the September 5th incident, Plaintiff's version of the events is that he must have said something that upset Lara because his arms were wrenched behind his back and Lara and Wilkins "jacked him up" off his knees and "slammed" him into a door. Defts' Ex. 4 (Doc. 83-4) at pgs. 35-37. Lara had his left arm and Wilkins his right. Id. at pg. 41.

Plaintiff indicates his arms were pulled so far up they were almost over his head. Defts' Ex. 4 (Doc. 83-4) at pg. 36. The pain in his right arm started getting intense and when Wilkins wrenched it a little more Plaintiff testified he started "hollering." Id. at pgs. 36-37. Plaintiff describes the pressure on his arms as enough to pull him "about off [his] feet." Id. at pg. 40. Plaintiff sought medical care, was sent for x-rays, and said the effects of his injury took several days to clear up.

Lara and Wilkins describe the incident differently. However, the Court is not allowed to accept one party's version over the other's unless that version is so clearly supported by the record that there is no question of fact. *Lambert v. City of Dumas*, 187 F.3d 931, 935 (8th Cir. 1999)(With nothing to support one version or the other, we adopt the version of the party opposing summary judgment). In this case, however, the facts are clearly controverted. Therefore, there is an issue of fact that precludes the entry of summary judgment in favor of Lara and Wilkins with respect to the September 5, 2013, incident.

-18-

### D.  Unlawful Detainment

Plaintiff maintains Bowman unlawfully detained him past the eight hour detoxification period.  As a result of this unlawful detainment Plaintiff states he appeared in court on August 15, 2013, in a jail uniform and shackles which he believes resulted in his bond being raised.

Plaintiff is not challenging the validity of his arrest for public intoxication; nor could he since neither Bowman nor any of the other Defendants were involved in the arrest.  Additionally, he does not challenge the BCDC's right to detain him for a period of time up to eight hours.  Plaintiff does not explain why he believes the law provides that a person arrested for public intoxication must be released after having been held for eight hours.

In the case of *Thompson v. Olson*, 798 F.2d 552 (1st Cir. 1986), the First Circuit, in connection with a state-law claim of false imprisonment, addressed the "implications of the continued detention of those lawfully arrested without a warrant for public intoxication." *McConney v. City of Houston*, 863 F.3d 1180, 1184 (5th Cir. 1989)(*citing Thompson*, 798 F.2d at 556).  The *Thompson* court  held that a "police officer's initial finding of probable cause justifies not only the arrest, but also a reasonable period of continued detention for the purpose of bringing the arrestee before a magistrate."  *McConney,* 863 F.2d at 1184-85 (concluding a person charged with public intoxication may constitutionally be detained for four or five hours); *see also Gerstein v. Pugh*, 420 U.S. 103, 114 (1974)(Fourth Amendment requires "a judicial determination of probable cause as a prerequisite to extended restraint of liberty following arrest").  The period of detainment may include a reasonable time for administrative processing, return of property, making bail (if appropriate), *etc.  McConney*, 863 F.3d at 1185 n.3.

-19-

Bowman maintains she is entitled to qualified immunity. "Government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "The qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Hunter v. Bryant*, 502 U.S. 224 (1991)(*quoting, Malley v. Briggs*, 475 U.S. 335, 343 (1986)). The inquiry is normally one of pure law. *J.H.H. v. O'Hara*, 878 F.2d 240 (8th Cir. 1989).

The doctrine of qualified immunity shields officials acting only in their individual capacities. *Brandon v. Holt*, 469 U.S. 464, 472-73 (1985). Any claims against the Defendants in their official capacities may not be defended against on the basis of qualified immunity. *Id.*

In addressing qualified immunity I must, considering the facts in the light most favorable to Plaintiff, determine whether the officer's conduct violated a constitutional right, and if it did, whether the right was "clearly established at the time of the deprivation such that a reasonable official would understand his conduct was unlawful in the situation he confronted." *Moore v. Indehar*, 514 F.3d 756, 759 (8th Cir. 2008) (citing *Saucier v. Katz,* 533 U.S. 194, 201 (2001)).

The facts are disputed as to whether Plaintiff was held for seven hours and fifty-six minutes or nine to nine and one-half hours. Under either time frame, I find Bowman entitled to qualified immunity. When she ordered the Plaintiff transported, Bowman knew he had a court appearance within a short period of time, had previously been charged with failure to appear, and that it appeared there was no one at the jail to pick the Plaintiff up. There was no clearly established law "such that a reasonable officer would understand that [her] conduct was

-20-

unlawful in the situation [s]he confronted." *Id.*   In short, a reasonable officer would not know that it was unlawful to order the Plaintiff transported to a court appearance rather than immediately releasing him after holding him for eight hours on a public intoxication charge.

Plaintiff also asserts an official policy claim against Benton County based on the fact that it failed to release him as soon as the eight hour period expired.  Plaintiff cannot prevail on this claim.  He does not maintain the policy itself is unconstitutional but instead that the failure to adhere to the policy caused his unconstitutional detention.  This argument depends on a requirement that the County strictly adhere to an eight hour policy.  No such requirement exists under the law.  This claim fails.

### E.  Wrongful Placement and Continued Detention in Segregation

Following the fight, both Plaintiff and Wishon were placed in administrative segregation. Plaintiff states he was acting in self-defense and should not have been cited with a disciplinary violation.  The disciplinary policy clearly lists fighting as an infraction for which disciplinary action may be taken.  Plaintiff was found guilty of fighting and given twenty days in disciplinary segregation.  Plaintiff states that he remained in disciplinary for twenty days while Wishon was allowed out after fifteen days.

No constitutional violation is stated.  Plaintiff admitted to fighting and was found guilty of fighting.  Riley was not involved in the decision making process as to whether Plaintiff was guilty of a disciplinary violation.  Long was not even involved in charging Plaintiff with a disciplinary violation.  Nor is there any suggestion in the record that either Riley or Long were involved in the decision to release Wishon from disciplinary confinement after serving only fifteen days.

-21-

### F.  Harassment, Verbal Abuse, Discrimination

Clearly, "[v]erbal threats do not constitute a constitutional violation." *Martin v. Sargent*, 780 F.2d 1334, 1339 (8th Cir. 1985).  Similarly, taunts, name calling, and the use of offensive language does not state a claim of constitutional dimension.  *McDowell v. Jones*, 990 F.2d 433, 434 (8th Cir. 1993)(inmate's claims of general harassment and of verbal harassment were not actionable under § 1983); *O'Donnell v. Thomas*, 826 F.2d 788, 790 (8th Cir. 1987)(verbal threats and abuse by jail officials did not rise to the level of a constitutional violation); *Martin*, 780 F.2d at 1338-1339 (being called an obscene name and threatened with adverse consequences unless he cut his hair and shaved does not state a claim of constitutional dimension);  *Black Spotted Horse v. Else*, 767 F.2d 516, 517 (8th Cir. 1985)(use of racially offensive language in dealing with a prisoner does not, by itself, state a claim).  *Cf. Burton v. Livingston*, 791 F.2d 97, 100-101 (8th Cir. 1986)(A claim was stated where the prisoner alleged "that a prison guard, without provocation, and for the apparent purpose of retaliating against the prisoner's exercise of his rights in petitioning a federal court for redress, terrorized him with threats of death").

Defendants alleged use of racially derogatory terms and verbal harassment, while deplorable, is insufficient to state a constitutional claim.  Defendants are entitled to the dismissal of the harassment and verbal abuse claims.

"Prisoners are protected under the Equal Protection Clause of the Fourteenth Amendment from invidious discrimination based on race."  *Wolff v. McDonnell*, 418 U.S. 539, 556 (1974)(citation omitted).  Only *deliberate* discrimination is actionable under the Equal Protection Clause.  *Personnel Administrator v. Feeney*, 442 U.S. 256 (1979); *Washington v. Davis*, 426 U.S.

229, 239- 48 (1976).  Thus, a claim of racial discrimination under the Equal Protection Clause requires a showing of discriminatory intent.  *Washington*, 426 U.S. at 239-40.

Here, there is no genuine issue of fact as to whether any of the named Defendants intentionally discriminated against the Plaintiff because he is Black.  While there is some disagreement as to what actually occurred between Plaintiff and the named Defendants on several occasions, there is no indication at all that the fact that Plaintiff is Black had any impact or effect on the Defendants' actions.  In short, there is nothing from which an inference of discrimination can be drawn.  Defendants are entitled to the dismissal of this claim.

## IV.  Conclusion

For the reasons stated, I recommend that Defendants' Motion for Summary Judgment (Doc. 81) be **GRANTED IN PART** and **DENIED IN PART.**

Specifically, I recommend it be granted with respect to: (1) all claims against Defendants Riley, Bowman, Kilpatrick, and Long; (2) all official capacity claims; (3) the unlawful detainment claims; (4) the wrongful placement and continued detention in segregation claims; and, (5) all harassment, verbal abuse, and discrimination claims.

I recommend that the Motion be denied with respect to the excessive force claims asserted against Defendants Lara and Wilkins arising out of incidents occurring on September 5, 2013.

I note that this is a non-consent case in which a jury demand has been made.  Once the summary judgment motion has been disposed of, the matter should be scheduled for a jury trial before the Honorable Timothy L. Brooks.

AO72A
(Rev. 8/82)

The parties have fourteen (14) days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.

DATED this 19th day of June, 2015.

/s/ Mark E. Ford
_____
HON. MARK E. FORD
UNITED STATES MAGISTRATE JUDGE

-24-